## KIRINCICH v. STANDARD DREDGING CO.
### No. 7953.

District Court, D. New Jersey.
Jan. 19, 1939.

Howard S. Tilton, of Camden, N. J., and Silas B. Axtell, of New York City, for libellant.

Howard M. Long, of Philadelphia, Pa., for respondent.

AVIS, District Judge.

The first question to be determined is with relation to the application of the libellant to amend his libel by setting out that an exemplified copy of the letters of administration granted to him in the State of Pennsylvania has been filed in the office of the Register of the New Jersey Prerogative Court. This amendment is offered because of the fact that counsel for the respondent questioned the jurisdiction of the Court to proceed, and claims that the libel should be dismissed by reason of its insufficiency in averment and a failure of compliance in fact with the alleged requirement that before the action was instituted the exemplified copy should have been filed. This contention is made because of the provisions of the New Jersey statute with relation to the prosecution of actions of a civil nature in the State courts. It is also applicable to actions of the same nature in the United States district court.

In the case of Buecker v. Carr, 60 N.J. Eq. 300, 47 A. 34, Vice Chancellor Grey, speaking for the Court of Chancery, held that "The object of the statute of 1896 [R.S.1937, 3:13–7] is to assure defendants that a party assuming to be an administrator under a foreign appointment was in fact what he claimed to be.

"This object, so far as the defendant is concerned, is fully attained by the filing of the exemplified copy at any stage of a pending suit at which he may assert his rights to the assurance." 60 N.J.Eq. page 308, 47 A. page 37.

It would appear that under the law in New Jersey the exemplified copy may be filed at any time before hearing.

However, I am satisfied that the law in New Jersey, while it may and does control the substantive law in actions of a civil nature, is not applicable to procedure in admiralty cases. The procedure and

practice is set out in 1 Corpus Juris, p. 1292, sec. 129 as follows: "The systems of pleading and the modes of practice of all the admiralty courts throughout the world are very similar. They bear more analogy to those of equity than to those of common law, but are even more free from technical rules than those of equity. In the United States the methods of procedure in such court do not conform to the laws of the state where the court is held but are uniform throughout the states."

"In this country, however, the procedure in admiralty does not conform to the laws of the various states but is uniform throughout the whole country." 2 C.J.S., Admiralty, § 70, page 146.

In the rules of practice in admiralty and maritime cases for the guidance of all Federal courts, promulgated by the United States Supreme Court December 6, 1920, it is provided in Rule 23 as follows: "In all informations and libels in causes of admiralty and maritime jurisdiction, amendments in matters of form may be made at any time, on motion to the court, as of course. And new counts may be filed, and amendments in matters of substance may be made, on motion, at any time before the final decree, on such terms as the court shall impose. And where any defect of form is set down by the respondent or claimant upon special exceptions, and is allowed, the court may, in granting leave to amend, impose terms on the libellant." 28 U.S.C.A. following section 723.

This rule authorizes the amendment as to substance in a very broad way, and the cases cited thereunder indicate that the broadest powers are given to the court, in cases where merit is shown and with due consideration for the rights of the opposite party.

In the case of The Hamilton, 2 Cir., 146 F. 724, the action had been instituted by the widow of decedent designated as "widow and executrix".

It appears that the right to recover under the law applied was in the widow and not in the executrix. The Circuit Court of Appeals held that the district court would have been justified in considering the word "executrix" as surplusage, but also approved of the action of the district court in allowing an amendment striking the words "and executrix", and said "That such an amendment was within the discretion of the court there can be no doubt." 146 F. page 728.

In the instant case the trial was had without specific objection challenging the right of the libellant to proceed. As a matter of fact, Mr. Long, representing the respondent at the hearing, when this question was raised, said: "I have no objection to the question if Mr. Axtel tells your Honor on the record that he intends to prove these letters by an exemplified copy of the letters." (Rec. p. 3.)

The motion to amend was made after the close of the taking of testimony, but the fact that the exemplified copy of letters had not been filed earlier, in no way prejudiced the respondent; it is purely technical, and the amendment does not involve in any way a new cause of action.

The exemplified copy has now been filed in the Register's office and another with the Clerk of this court. The fact that the libellant is qualified to proceed is not controverted.

The motion to amend will be allowed.

This brings us to the consideration of the right of the libellant to recover under the pleadings and evidence. The libel alleges that decedent, on or about February 19, 1933, was in the employ of respondent as a deck hand on the pumping dredge Tampa, operating in the inland waters of the State of Florida at or near Port Everglades. On the date aforesaid decedent was assigned with others to assist in the moving of a certain barge loaded with pipe used for conveying mud and water from the place where dredged to a place of deposit, and a certain derrick barge to the piers at Port Everglades. The power for the movement was a small tug or launch named Mary. This tug was estimated to be about 35 feet in length, 8 to 10 foot beam, and was equipped with a Diesel engine as motive power.

The evidence satisfies me that the barge was the first vessel back of the tug, and was connected to the tug by what is called a bridle, i. e., a hawser or rope attached to each of the forward corners of the barge, connected forward of the barge, forming a triangle, to which was attached a single line fastened to a bit on the stern of the tug. The distance between the tug and the barge was variously estimated from 15 to 25 feet. The derrick was fastened to the stern of the barge by ropes from the corner of each, so that the barge and derrick were in actual contact, comprising in effect a single vessel.

The testimony is conflicting as to whether the derrick's stern or bow was next to

the stern of the barge. The testimony sustains the conviction that the derrick was proceeding stern first, although for the purpose of determining the question here involved it makes no difference.

In this manner the tug and tow proceeded from the vicinity of the dredge to the pier or wharf at Port Everglades, a distance of about two miles. At this port the water had a depth of approximately 35 feet, and had been dredged to permit the passing and docking of large vessels.

The testimony shows that at the point of destination there were two piers, probably a couple of hundred feet or more apart, and of considerable length extending out in the channel; that about 4 o'clock A. M., the tug slowly approached the pier on its starboard side, the highest estimate of headway, as testified to by any witness, being at the rate of 2 or 3 miles per hour. When the tug had reached a point just within the outer edge of the pier, a splash was heard in the water and a voice calling for help. It was then ascertained by parties on the barge or derrick that libellant's decedent had in some manner fallen overboard. Just prior to this happening libellant's intestate had been working in some manner on a wire cable on the derrick, and had been directed to go to the barge for the purpose of assisting in fastening the vessels to the pier.

Immediately upon hearing the splash and cry for help, the mate, E. A. Eliason, who was on the derrick, obtained a rope and threw the same or a portion thereof in the direction from which the cries for help were coming, and repeated said action but without results. At about the same time W. H. Funderbuck, a deck hand on the vessel, also obtained another rope and three times threw a line to or near the drowning man. This witness testified that the end of the rope was within two feet of the man in the water, but that he failed to make any effort to grasp it. The mate, not being able to help the man in the water with the rope, cut away the derrick from the other vessel, permitting it to drift aft, and jumped on the pier and hurried to the person in charge of the tug—the tug was disconnected from the barge, its tow, and moved to the vicinity of the spot where the man in the water was last seen; cruised in the neighborhood in circles for one-half or three-quarters of an hour but was unable to find or help the man who had fallen overboard. Later, at about 8:30 or 9 o'clock A. M., the body was recovered by the Coast Guard.

The proof established the fact that the tug carried life preservers, but no rings or other apparatus for life saving purposes. Nothing of this character was carried on the barge or derrick. At the time the drowning took place, it was dark and a stiff current was running. None of the remaining men on the vessels jumped overboard in an effort to save the drowning man.

The claim of the libellant is based upon sundry charges of negligence, and to sustain his action the burden is upon him to prove such negligence by a clear and fair preponderance of the evidence.

The charges of negligence are:

(a) "In that the said steam derrick barge and tug were not properly manned and equipped, and did not have on board a competent master and crew who were attentive to their duties."

As to this charge, I find no evidence in support thereof, unless it should be determined that special life saving equipment is required, which will be later discussed.

(b) "In that the master and crew of the tug failed to heed the shouts and cries notifying them that a man was overboard."

The evidence is conclusive that the master and crew, without endangering their own lives, used every reasonable effort to rescue the drowning man.

(c) "In that the master and crew of the tug failed to stop the tug and tow after they had been advised that a man had fallen overboard."

The action of the master and crew was entirely in contradiction of this charge.

(d) "In that the said steam derrick barge and tug at the time of the accident and immediately prior thereto, were not being properly managed, operated, controlled and navigated."

There is no evidence to support this charge.

(e) "In that there were not sufficient lights on the said steam derrick barge."

While the vessels do not seem to have been brilliantly lighted, no evidence was produced to indicate that there was a noncompliance with any law, regulation or custom.

(f) "In that there were no life boats nor life preservers on the said steam derrick barge."

This allegation was sustained in fact, and its effect will be later discussed.

(g) "In that the respondent failed to have on board the said steam derrick barge and tug the necessary and proper equipment for saving the life of the decedent after he had fallen overboard."

This charge will be later discussed.

(h) "In that those on board the steam derrick barge and tug failed to exercise reasonable diligence to save the decedent after it was ascertained that he had fallen overboard and was in danger of his life."

This charge was not sustained by the evidence.

(i) "In that the respondent, its agents, servants and employees, failed to rescue the decedent."

This charge relates to an ultimate fact and cannot be considered as containing any allegations of negligence.

(j) "In such other respects to be shown at the trial of this cause."

This charge is without specification and is included in other stated claims.

The only matters for decision arise out of claims or charges under subdivisions (f) and (g).

A number of cases have been cited by counsel for each of the parties, and it appears in these cases that some have held the equipment of the vessels sufficient, while others have held the equipment insufficient. Each case has been determined in accordance with the facts developed therein. No fixed rule of law has been declared in any of them.

In the instant case, therefore, the Court's duty is to ascertain if there was negligence on the part of respondent in failing to equip the barge or derrick with life saving apparatus in addition to that shown to have been aboard the vessels, and which failure was the proximate cause of the drowning of libellant's intestate. The tug was equipped with life preservers, but the other vessels apparently had no special equipment of that character.

On this point counsel for libellant cites the case of Norfolk Southern R. Co. v. Foreman, 4 Cir., 244 F. 353, and sets forth a long quotation, alleged to have been taken from the opinion in that case. A comparison shows several omissions and some misstatements, such as: "It seems to this Court respondent below was negligent", which does not appear in the text of the opinion.

The quotation omits the words "as in the present case," found in the opinion, and which confined the decision to the facts therein stated, whereas the quotation in the brief would lead this Court to believe that the application of the doctrine expressed was general in its nature.

A copy of the quotation in brief, with omitted words in parentheses and italicized is as follows: "*(It seems to this court that)* if an employer requires its employees to work in a place where they may be subjected to the danger and peril of being precipitated into the water, *(as in the present case,)* there should be provided devices and facilities reasonably fit and accessible to ward off a fatal [eventuality] *(eventuation)* by effecting a rescue if reasonably possible." See, 244 F. pages 360, 361.

The inadvertent or intentional omission of the inserted words misrepresents entirely the decision of the court in that case. It is apparent that the sentence in the opinion was not intended to establish a general principle, but to apply to the particular facts of that case, which consisted in placing the decedent in a position of unusual peril. The case refers to the equipment of the tug, not that of the barge.

In the cited case of The G. W. Glenn, D.C., 4 F.Supp. 727, the court did say that "The duty of the ship and owner to rescue a seaman overboard necessarily implies the duty to provide the means of rescue" (4 F.Supp. page 730), but that case involved a sailing oyster schooner, a boat propelled by the wind with a sail erected thereon, or by power, as apparently that boat had. It might well be that on such a boat effective means of rescue should be carried.

A boat of that character is entirely different from the barge and derrick towed by a power boat upon which life saving apparatus was installed. I cannot bring myself to the conclusion that such a vessel is required, under the circumstances in this case, to carry life preservers and equipment of that character.

From the testimony produced, it is not reasonably clear, if the barge had been so equipped, that the result would have been different. There is no assurance that the drowning man could have been reached by a ring or life preserver. Actually the testimony indicates that he was unable to grasp a rope within two feet, and it is questionable if he could or would have grasped a ring or preserver if it had been launched.

I find as facts:

(1) That libellant's intestate, on February 19, 1933, was employed by respondent as a deck hand on the dredge Tampa, which was working in intercoastal waters in the vicinity of Port Everglades, Florida.

(2) That on the date aforesaid libellant's intestate was assigned to and was working as a deck hand on a derrick and barge in tow of the tug Mary, making a trip from the vicinity of the dredge Tampa to a wharf at Port Everglades.

(3) That as the tug with tow approached the wharf, libellant's intestate in some manner, not explained, fell overboard from the derrick and was drowned.

(4) That the personnel engaged with libellant's intestate, including captain or operator of the tug, mate, and deck hands, did everything reasonably possible to rescue the drowning man, with the equipment at hand or on the vessels.

(5) That the life saving equipment on the tug and tow was all that was required at the time and under the circumstances surrounding the accident and casualty.

(6) That neither the respondent nor its employees were guilty of actionable negligence.

My conclusions of law are that, owing to the fact that respondent was not guilty of actionable negligence, the libellant cannot recover.

The libel will be dismissed.